UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

LETHORN RAYE IRVING,                )
                                    )
                 Petitioner,        )        Case No. 1:03-cv-506
                                    )
v.                                  )        Honorable Gordon J. Quist
                                    )
LINDA METRISH,                      )
                                    )        **REPORT AND RECOMMENDATION**
                 Respondent.        )
_____ )

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254. Petitioner is serving a term of thirty to forty-five years, imposed by the Ingham County

Circuit Court on December 12, 1998, after a jury convicted Petitioner of conspiracy to deliver 650

grams or more of cocaine, MICH. COMP. LAWS §§ 750.157A and 333.7401(2)(a)(i). In his *pro se*

petition, Petitioner raises nine grounds for relief, as follows:

   I.    WHETHER PETITIONER WAS DEPRIVED OF HIS FIFTH AND
         FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS WHERE
         THE COURT DENIED A MOTION TO QUASH THE INDICTMENT.

   II.   WHETHER PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONAL
         RIGHT TO DUE PROCESS WHEN HE WAS DEPRIVED OF HIS RIGHT
         TO A SPEEDY TRIAL AND THE BENEFIT OF THE RULE GOVERNING
         THE 180 DAYS TO TRY THE CASE.

   III.  WHETHER PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONAL
         RIGHT TO A FAIR TRIAL WHERE THE TRIAL PROSECUTOR
         COMMINGLED ADDITIONAL STATEMENTS AS PART OF HIS VOIR
         DIRE INTERROGATION DEPRIVING PETITIONER OF A FAIR TRIAL.

   IV.   WHETHER PETITIONER WAS DEPRIVED OF HIS FIFTH AND
         FOURTEENTH AMENDMENT RIGHTS AND A FAIR TRIAL WHEN

THE COURT ADMITTED EVIDENCE OF PRIOR BAD ACTS INTO THE TRIAL.

V.    WHETHER THE TRIAL COURT'S FAILURE TO CHARGE INCLUDED OFFENSES DEPRIVED PETITIONER OF FUNDAMENTAL DUE PROCESS AND A FAIR TRIAL.

VI.    WHETHER PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL WHERE THE PROSECUTOR VOUCHED FOR THE CREDIBILITY OF HIS WITNESS DEPRIVING [PETITIONER OF] DUE PROCESS OF LAW AND A FAIR TRIAL.

VII.    PETITIONER WAS DEPRIVED OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION WHERE HIS [GRAND] JURY ARRAY VIOLATED THE FAIR CROSS SECTION OF THE COMMUNITY BY EXCLUDING AFRICAN AMERICANS FROM THE [GRAND] JURY SELECTION PROCESS.

VIII.    PETITIONER WAS DEPRIVED OF HIS RIGHT TO A FAIR TRIAL WHERE THE EVIDENCE PRESENTED BY THE PROSECUTOR WAS INSUFFICIENT TO JUSTIFY A GUILTY VERDICT REQUIRING REVERSAL.

IX.    PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL WHERE THE PROSECUTOR ALLOWED FALSE EVIDENCE AND PERJURED TESTIMONY TO ENTER THE TRIAL WITHOUT CORRECTING IT ALLOWING A FRAUD TO BE PERPETRATED UPON THE COURT.

Respondent has filed an answer to the petition (docket #10) stating that the petition should be denied.

Petitioner filed a reply to the answer (docket #36). Upon review and applying the AEDPA standards,

I find that Petitioner's claims are procedurally defaulted or fail to raise a meritorious federal claim.

Accordingly, I recommend that the petition be denied.

# Procedural History

## A.       Pre-Trial Proceedings[1]

Upon petition filed by Clinton, Eaton and Ingham County prosecutors, the Michigan Court of Appeals issued an order convening a multicounty grand jury pursuant to MICH. COMP. LAWS § 767.7b *et seq.  In re Petition for Multicounty Citizens' Grand Jury*, Docket No. 181751 (Jan. 13, 1995).  The order provided that the grand jury would consist of seventeen jurors: six jurors from Ingham County, six jurors from Eaton County, and five jurors from Clinton County.  The order also granted the prosecution's motion to suppress the record of the grand jury proceeding and the contents of the petition until further order of the court under MICH. COMP. LAWS 167.19f and M.C.R. 7.216(A)(7).

On June 8, 1995, Petitioner was indicted by the multicounty grand jury on one count of conspiring to deliver 650 grams or more of cocaine.  Petitioner was arraigned on the grand jury indictment on June 15, 1995.  Appointed defense counsel filed an appearance and a demand for a speedy trial. On July 14, 1995, Petitioner retained counsel who was substituted for appointed counsel.  On the advice of retained counsel, Petitioner waived his right to a preliminary examination on August 4, 1995. On September 8, 1995, Petitioner's retained counsel was replaced by the original appointed counsel who again filed an appearance and a demand for a speedy trial.  Appointed counsel also filed a motion to remand to district court for a preliminary examination, arguing that retained counsel was ineffective for advising Petitioner to waive the preliminary examination.  The

---

[1]The facts regarding pre-trial proceedings are taken primarily from the opinion of the Michigan Court Appeals. *See People v. Irving*, No. 216966 (Mich. Ct. App. Nov. 30, 2001) (docket #28).  Petitioner neither provides a comprehensive chronology of the pre-trial proceedings nor disputes the procedural history set forth by the Michigan Court of Appeals.  Accordingly, the Michigan Court of Appeals' chronology of events is entitled to a presumption of correctness.  28 U.S.C. § 2254(e)(1).

prosecutor did not oppose the motion and the circuit court remanded the case to the district court for a preliminary examination.

In September 1995, Petitioner was provided with copies of transcripts from the grand jury proceeding; however, the transcripts had been redacted by the prosecutor and had not been certified by the chief judge of the county in which the grand jury was convened pursuant to M.C.R. 6.107. In October 1995, Petitioner filed a motion with the chief judge presiding over the grand jury to certify which grand jury transcripts would be made available. The parties stipulated to adjourn the preliminary examination until the transcripts were released to Petitioner. Petitioner specifically waived his right to a prompt preliminary examination during this time. The grand jury transcripts were certified by the chief judge and released to Petitioner on February 28, 1996.

The preliminary examination was not re-scheduled until almost one year later on February 14, 1997. On February 13, 1997, the day before the preliminary examination was to be held, Petitioner filed a motion to dismiss the charges, alleging a violation of his right to a speedy trial. The following day, Petitioner filed a motion to quash the information, alleging that the grand jury indictment failed to specify the crimes to be investigated, the grand jury statute unconstitutionally precluded challenges to the jury array, and the grand jury was underrepresented by African-Americans. The state district court denied the motions, but stayed the proceedings, including the preliminary examination, pending an appeal to the state circuit court. The circuit court found that much of the delay was caused by the proper purpose of redacting grand jury transcripts and, while much of the remaining delay was unexplainable, Petitioner was not prejudiced because he "had the appropriately redacted transcripts from which he could prepare his defense." The circuit court affirmed the district court's ruling and ordered that the preliminary examination be scheduled

within fourteen days of the order.  The circuit court also affirmed the district court's denial of Petitioner's motion to quash the indictment.

Apparently, in the course of transmitting the file from the circuit court back to the district court, the file was lost and had to be reconstructed by counsel.  The preliminary examination was eventually held on February 24, 1998, and Petitioner was bound over to circuit court for trial. A felony information charging Petitioner with conspiracy to deliver 650 grams or more of cocaine was filed on March 3, 1998.

On June 3, 1998, Petitioner filed another motion to dismiss the case based on an alleged violation of his right to a speedy trial, and another motion to quash the grand jury indictment. In his motion to dismiss, Petitioner argued that prejudice was presumed because the delay exceeded eighteen months. Petitioner further argued that he suffered actual prejudice because the memories of prosecution witnesses had faded, impeding his ability to challenge specific testimony about the details of the charged offense. The circuit court denied Petitioner's motion, noting that only four months had elapsed since the preliminary examination and it had already held that Petitioner was not denied his right to a speedy trial before the preliminary examination.  In his motion to quash the indictment, Petitioner reiterated his argument that the grand jury statute was unconstitutional and that the jury composition discriminated against African-Americans. The circuit court denied the motion, finding that the absence of African-Americans on this grand jury panel did not automatically equate to a systematic exclusion and, in any event, the preliminary examination during which the prosecution established probable cause cured any defects in the grand jury selection process.

On September 14, 1998, the Michigan Court of Appeals denied Petitioner's application for leave to appeal the circuit court's order denying his motion to dismiss the charge and

- 5 -

quash the information. *See People v Irving*, Docket No. 213621 (Mich. Ct. App. Sept. 14, 1998). On September 16, 1998, Petitioner filed a third motion to dismiss the charge, arguing that the three additional months of delay since his previous motion was denied resulted in a violation of his right to a speedy trial. The circuit court denied the motion because the case was scheduled for trial in two weeks. Trial began on September 29, 1998.

### B. Trial Court Proceedings

A six-day jury trial commenced on September 29, 1998. Tamper Allen testified pursuant to his plea agreement, for which he pleaded guilty to conspiracy to deliver 50 to 225 grams of cocaine. (Tr I, 159.) Allen testified that he sold small amounts of crack cocaine in Lansing in the early 1990s. (Tr I, 161.) His drug suppliers included Tracy Edmond, (unknown) McKinley and (unknown) Fortner. Allen testified that he and Petitioner became partners in late 1990 or early 1991. (Tr I, 168.) Allen and Petitioner became partners at the suggestion of Tracy Edmond, to whom Petitioner owed a debt. Allen loaned Petitioner $10,000 for the drug debt he owed to Edmond, in exchange for which Allen was to receive fifteen ounces of cocaine or $10,000 from his next shipment of cocaine. (Tr I, 170-71; Tr II, 98.) Edmond told Allen that he would continue fronting cocaine to Petitioner only if he was working with Allen. (Tr II, 99.) Allen became partners with Petitioner so he could get paid back. Allen never received full payment. (Tr I, 171.)

In 1992, Tracy Edmond and William Darten delivered a kilo of cocaine (approximately 1000 grams) to Allen and Petitioner at Allen's home in Holt, Michigan. (Tr I, 177.) They took the cocaine on consignment and agreed to pay Edmond $27,000 after it was sold. (Tr II, 6.) Allen and Petitioner agreed that Allen would take five or six ounces to make crack cocaine for sale on the street and Petitioner would sell the rest of the powder to his customers who wanted larger

amounts.  (Tr I, 178; Tr II, 42.)  After they sold the cocaine, Allen and Petitioner paid Edmond.  (Tr II, 11.)  Edmond delivered another kilo of cocaine to Allen and Petitioner at Petitioner's girlfriend's house in 1992.  (Tr II, 8-9.)  Allen took even less to sell; Petitioner sold most of the second kilo to his customers.  (Tr II, 12, 42, 94.)  Allen saw Petitioner front cocaine to other individuals, including McKinley (aka "June"), Fortner (aka "Tone") and Toliver Bragg (aka "Big Mike").  (Tr II, 13.)  Allen and Petitioner also received smaller amounts of cocaine from Edmond that amounted to about fifteen ounces.  (Tr II, 19-20, 25, 90.)  Allen never received drugs from Edmond without Petitioner being present.  (Tr II, 97-98.)  Allen and Petitioner had a falling out in 1992, and Petitioner and Edmond stopped dealing with him. (Tr II, 23.)

Michael ("Mike") Sorrell testified that he was released from prison on October 11, 1990, but was sent back on December 17, 1991, due to a parole violation.  (Tr II, 136.)  In November 1990, Mike purchased cocaine from Petitioner.  (Tr II, 139.)  Shortly thereafter, Mike began selling cocaine for Petitioner.  (Tr II, 141.)  Their business relationship continued until March or April of 1991.  During that period, Mike drove Petitioner to Detroit once or twice a week to pick-up cocaine. (Tr II, 141-42, 159.)  Mike  testified that Petitioner purchased as much as a kilo of cocaine at one time.  (Tr II, 143-44.)  Mike personally sold more than four kilos of cocaine for Petitioner.  (Tr II, 145.)

William ("Bill") Sorrell, Mike's brother, testified that he was in prison for a drug conviction from January 1, 1992 to December 13, 1996.  (Tr III, 7.)  Bill testified that he became acquainted with Petitioner in late 1989, when Bill did some car repairs for him.  (Tr III, 8.)  Petitioner told Bill that he wanted a V-8 engine in his car because he was handling drugs and wanted to be able to outrun the police.  (Tr III, 11-12.)  Bill testified that he also drove Petitioner to Detroit

to purchase drugs approximately twenty-five times from late 1989 to early 1991. (Tr III, 15-16, 34-42.) Petitioner sometimes counted the money in the car on the way down. (Tr III, 17.) Bill testified that he saw Petitioner purchase large zip-lock bags full of powder cocaine. (Tr III, 16-17, 19.) Petitioner directed Bill to the drug houses in Detroit where he purchased the cocaine. (Tr III, 19.) Bill estimated that Petitioner purchased 15 to 20 kilos of cocaine during the period that Bill was driving him to Detroit. (Tr III, 33.) Bill also drove Petitioner around so he could drop off drugs to his sellers and pick-up profits. (Tr III, 24.) Bill testified that "Be Right", Anthony Fortner, "June", "High Top" and "Dollar" worked for Petitioner selling drugs. (Tr III, 13-14.) He also indicated that Petitioner and Tamper Allen were partners "in the drug game." (Tr III, 29.)

Tracy Edmond testified that he was serving a seventeen-year sentence in federal prison for distribution of more than five kilos of cocaine. (Tr IV, 5.) Edmond hoped that testifying in Petitioner's case would help him earn an early release from prison. (Tr IV, 6.) Edmond testified that he began selling small quantities of cocaine in the late 1980s, and progressed into larger quantities in 1990. (Tr IV, 10.) Edmond and a friend, Damon Costca, purchased five to ten kilos of cocaine at a time from a source in Florida. (Tr IV, 13.) Edmond and Costca sold the cocaine and split the profits. (Tr IV, 13.) Edmond testified that he started doing business with Petitioner in 1990. (Tr IV, 16.) He contacted Petitioner because he heard that Petitioner moved a lot of cocaine in Lansing. (Tr IV, 16-17.) Edmond first fronted Petitioner nine ounces of cocaine. (Tr IV, 18.) Petitioner sold the cocaine within a week and paid Edmond. (Tr IV, 18-19.) According to Edmond, he and Petitioner did five to ten transactions involving nine ounces of cocaine. (Tr IV, 19-20.) Edmond testified that Petitioner moved up to half a kilo in 1991. (Tr IV, 20.) Edmond estimated that they engaged in five to ten transactions involving a half kilo. (Tr IV, 21.) They eventually moved up to kilo transactions in late 1991 and 1992. (Tr IV, 23.) Edmond testified that he sold

- 8 -

Petitioner a kilo of cocaine anywhere from ten to twenty times. (Tr IV, 24.) By the time they became partners in late 1992 or 1993, Edmond estimated that he had sold Petitioner twenty kilos of cocaine. (Tr IV, 24.)

Edmond testified that Tamper Allen was selling ounces of cocaine for him in 1990. (Tr IV, 25.) Edmond stopped doing business with Allen because he was taking too long to pay for the cocaine. (Tr IV, 26.) In late 1991 or 1992, Petitioner borrowed money from Allen to pay a debt he owed to Edmond. (Tr IV, 27-28.) Edmond suggested that Petitioner and Allen work together so Petitioner could pay his debt to Allen. (Tr IV, 28-29.) Petitioner and Allen agreed to work as partners and split the profits. (Tr IV, 31-32.) Edmond recalled making two deliveries to Petitioner and Allen involving one kilo each. (Tr IV, 29-34.) Edmond testified that Allen became unhappy with Petitioner because he did not repay his debt to Allen, so Edmond terminated the partnership between Petitioner and Allen. (Tr IV, 34-35.) Edmond kept Petitioner as a business associate because they had become close friends. (Tr IV, 35.) According to Edmond, he and Petitioner became partners in late 1992 or 1993. (Tr IV, 36.) The partnership did not work out for long because Petitioner kept coming up short with the money. (Tr IV, 38.)

Karen Martinez testified that Petitioner was her boyfriend for five or six years. (Tr V, 48, 68.) They lived together in Lansing throughout their relationship. (Tr V, 49.) Martinez ended the relationship in October 1990, when she learned that Petitioner was having children with three other women. (Tr V, 49-50, 66.) Martinez testified that Petitioner worked on cars, but did not have a regular job while they dated. (Tr V, 54-55.) They had a small safe in their apartment. Martinez did not have the safe combination, but the only things she ever saw in it were papers. (Tr V, 56, 65.) Martinez knew Tracy Edmond because he came to their apartment and talked with Petitioner. (Tr V,

- 9 -

55.) Between June of 1989 and October of 1990, Petitioner picked-up Martinez from work a couple of times per month.  Sometimes Petitioner stopped at houses on the way home to pick up money. (Tr V, 58.) During the same period, Martinez and Petitioner went to visit his mother in Detroit about twice a month.  (Tr V, 70.)  While they were in Detroit, Petitioner would leave Martinez with his mother and go with one of his friends for a couple of hours or the day.  (Tr V, 70.)  Petitioner had a pager that went off five or six times an hour.  (Tr V, 71.)  When Martinez asked Petitioner where he got his money, he told her, "the less you know, the better off you are."  (Tr V, 58.)  Marinez testified that she saw Petitioner use marijuana, but she never saw him with cocaine.  (Tr V, 63-64.) When Petitioner's friends came to visit at their apartment, Martinez always went to her room.  (Tr V, 64.)

Laresa Edwards testified that she had a relationship with Petitioner from 1986 until about April of 1990.  Edwards gave birth to Petitioner's child in August 1990.  (Tr V, 77.)  Her testimony focused on the period from June of 1989 through April of 1990.  (Tr V, 77.)  Edwards testified that she did not have direct knowledge of Petitioner engaging in illegal activities during that time period, but acknowledged testifying before the grand jury that Petitioner and Tone dealt crack cocaine on Lansing's east side.  (Tr V, 84.)  She also acknowledged testifying before the grand jury that she saw Petitioner and Tone with ten ounces of cocaine at her house on Kilborn in 1988 or 1989. (Tr V, 87, 94-96.)  Petitioner and Tone had keys to her house.  Edwards testified that she had seen Petitioner in possession of four-and-a-half ounces of cocaine, but could not recall whether it was within the prescribed time period.  (Tr V, 79.)  She also testified that she saw Petitioner cook rock cocaine one time, but could not remember when.  (Tr V, 80.)  Edwards testified that she and

Petitioner's relationship ended badly and that she was still angry at Petitioner when she testified before the grand jury in 1995.  (Tr V, 92-93.)

William Byrnes, a Lansing police officer, was called by the defense.  (Tr V, 109.) Byrnes testified that he was assigned to the Tri-County Metro Narcotics Squad from 1991 to 1994 and 1995 to 1998.  (Tr V, 109.)  Byrnes participated in an interview of Tracy Edmond on September 19 or 20, 1994.  (Tr V, 111-12.)  According to Byrnes report from the interview, Edmond indicated that his first transaction with Petitioner involved nine ounces of cocaine, the next deal was a half kilogram of cocaine, and every time after that was for one kilogram of cocaine.  (Tr V, 117-18.)

### B.  Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief filed by appellate counsel raised eight grounds for relief.  Plaintiff set forth three additional claims in a supplemental *pro se* brief.  (*See* Def.-Appellant's Br. on Appeal, docket #28.)  The nine grounds for habeas corpus relief asserted by Petitioner were among the claims raised by Petitioner in the Michigan Court of Appeals.  By unpublished opinion issued on November 30, 2001, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See People v Irving*, Docket No. 216966 (Mich. Ct. App. Nov. 30, 2001) ("MCOA Op."), docket #28.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  By order entered July 29, 2002, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See People v. Irving*, Docket No. 213621 (Mich. July 29, 2002), docket #29.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

- 12 -

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

- 13 -

<u>**Discussion**</u>

I.      **Grounds I and VII: Grand Jury**

Petitioner, who is African-American, first claims that he was entitled to quash the indictment because the state statute under which his grand jury was selected did not allow him to challenge the grand jury array on grounds of racial discrimination in the selection process. Respondent maintains that Petitioner's claim must fail because, contrary to Petitioner's construction of the statute in question, the Michigan courts have interpreted the statute as allowing for such a challenge.

In addressing the issue on appeal, the Michigan Court of Appeals stated:

Defendant argues that the trial court erred in denying his motion to quash the indictment because MCL 767.14, the statute under which the grand jury was organized, precluded him from challenging the grand jury array based on racial discrimination in the selection process in violation of his constitutional rights. We disagree.

Statutory interpretation and constitutional challenges are legal issues that are reviewed de novo. *People v Connor*, 209 Mich App 419, 423; 531 NW2d 734 (1995).

MCL 767.13 provides:

A person held to answer to any criminal charge may object to the competency of any 1 summoned to serve as a grand juror, on the ground that he is the prosecutor or complainant upon any charge against such person; and if such objection be established, the person so summoned shall be set aside.

MCL 767.14 provides:

No challenge to the array of grand jurors, or to any person summoned as a grand juror, shall be allowed in any other case than that specified in the preceding section.

This Court recently held that "under a long line of United States Supreme Court precedence, it is beyond question that defendant may challenge the selection

- 14 -

of the grand jury under the Equal Protection Clause of the Fourteenth Amendment." *People v Glass*, 235 Mich App 455, 463-464; 597 NW2d 876 (1999), rev'd on other grounds 464 Mich 266 (2001), citing *Vasquez v Hillery*, 474 US 254, 261; 106 S Ct 617; 88 L Ed 2d 598 (1986); *Strauder v West Virginia*, 100 US 303; 25 L Ed 2d 554 (1880). See also *People v Glass (After Remand)*, 464 Mich 266, 285 n 15; 627 NW2d 621 (2001).[2] The *Glass* Court further held that a defendant may also allege a Sixth Amendment constitutional violation with respect to the selection of a grand jury.

> Therefore, despite the dictates of MCL 767.13; MSA 28.953 and MICH. COMP. LAWS 767.14; MSA 28.954, a criminal defendant may certainly allege a constitutional violation with respect to the selection of a grand jury. These statutes cannot preclude a constitutional challenge to the grand jury selection process, and we do not read these provisions as attempting to do so. It is axiomatic that the Legislature cannot enact a statute that runs afoul of the constitution or attempts to narrow constitutional rights. Rather, the proper analysis is that challenges to the grand jury selection process may be based on the fair-cross-section requirement of the Sixth Amendment, the Equal Protection Clause of the Fourteenth Amendment, *or* an applicable statutory provision. [*Glass*, *supra* 235 Mich App 465-466; emphasis in original.]

Thus, contrary to defendant's argument, the statutes in question do not preclude constitutional challenges to the grand jury array based on alleged racial discrimination in the selection process; rather, the statutes "protect the grand jury from 'technical' challenges or defects." *Id.* at 466. See also *People v Lauder*, 82 Mich 109, 135; 46 NW 956 (1890). In fact, defendant's racially based challenge to the grand jury array was adjudicated and rejected by the lower court. Accordingly, the trial court did not err in denying defendant's motion to quash the indictment on this ground.

(MCOA Op. at 3-4.)

---

[2] While reversing this Court's decision in *Glass* on other grounds, our Supreme Court explicitly stated that:

We agree with the Court of Appeals that a defendant can challenge the grand jury selection process on Fourteenth Amendment equal protection grounds, notwithstanding MCL 767.13, 767.14, which the prosecutor argued precluded such challenges. [*People v Glass (After Remand)*, 464 Mich 266, 285 n 15; 627 NW2d 621 (2001).]

Relying on the Supreme Court's decision in *Glass*, the court of appeals found that a defendant may challenge the selection of the grand jury in the Michigan state courts under the Sixth Amendment and the Equal Protection Clause of the Fourteenth Amendment. It is not the province of this Court to second-guess the Michigan courts' interpretation of its own state law. *See Seymour v. Walker*, 224 F.3d 542, 558 (6th Cir. 2000) ("it is not for this court to question the state court's interpretation of its own law"); *see also Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988); *Smith v. Sowders*, 848 F.2d 735, 739 (6th Cir. 1988). Moreover, while Petitioner insists that the Michigan statute does not allow a challenge to the grand jury array on any ground, he made such an attack in this case. As noted by the Michigan Court of Appeals, the trial court considered the merits of Petitioner's challenge to the racial composition of the grand jury.

In Ground VII, Petitioner contends that African-Americans were systematically excluded from the grand jury array in violation of his Sixth Amendment right to an impartial jury composed of members from a fair cross-section of the community and his Fourteenth Amendment right to equal protection. There were no African-Americans on Petitioner's grand jury. Petitioner contends that Clinton County represents 13.8% of the total population of the three counties and is 3.85% African-American; Eaton County represents 21.47% of the total population of the three counties and is 3.56% African-American; and Ingham County represents 65.16% of the total population of the three counties and is 9.87% African-American. Defendant thus argues that the order directing that five grand jurors be selected from Clinton County, six jurors come from Eaton County, and six jurors be from Ingham County amounted to a systematic overrepresentation of Eaton and Clinton Counties and a systematic underrepresentation of Ingham County, which has the largest percentage of African-Americans. Defendant maintains that if proper percentages had been used,

eleven jurors would have come from Ingham County, four jurors would have been from Eaton County, and only two jurors would have been from Clinton County.

As an initial matter, cases challenging the makeup of state grand juries may be analyzed only under the Equal Protection and Due Process Clauses of the Fourteenth Amendment. *See Campbell v. Louisiana*, 523 U.S. 392 (1998).[3] It is well established that a criminal defendant has a Sixth Amendment right to a state *petit* jury drawn from a fair cross-section of the community. *See Taylor v. Louisiana*, 419 U.S. 522 (1975). However, under Sixth Circuit authority, this Sixth Amendment protection does not extend to state *grand* juries because the Fifth Amendment right to a grand jury does not apply to state prosecutions. *See Ford v. Seabold*, 841 F.2d 677, 688 (6th Cir. 1988). Moreover, the Supreme Court has never applied the Sixth Amendment fair cross-section requirement to the selection process for state grand juries. *See Campbell*, 523 U.S. at 403 (declining to address whether the Sixth Amendment right to a fair cross-section extends to state grand juries). In the absence of clearly established Supreme Court precedent supporting his Sixth Amendment fair cross-section claim, Petitioner cannot establish a basis for relief under the AEDPA.

In order to prove discrimination in the selection of grand jurors in violation of the Equal Protection Clause, a petitioner may show that the procedure employed by the state resulted in a substantial underrepresentation of his race or of the identifiable group to which he belongs. *Castaneda v. Partida*, 430 U.S. 482, 494 (1977). Specifically, to establish a prima facie case of discrimination, a petitioner must satisfy a three-part test. First, he must establish that the group excluded from the grand jury is one that is a recognizable, distinct class capable of being singled out

---

[3]In this case, Petitioner asserts a Sixth Amendment fair cross-section claim and a Fourteenth Amendment equal protection claim, but not a due process claim.

for different treatment under the laws.  *Id.*  Second, he must establish that the selection procedure

used by the state to select grand juries is susceptible to abuse or is not racially neutral.  *Id.*  Finally,

he must establish the degree of underrepresentation occurring over a significant period of time by

comparing the proportion of the excluded group in the total population to the proportion serving as

grand jurors.  *Id.*  Once the petitioner has established a prima facie case, the burden shifts to the state

to rebut the inference of intentional discrimination.  *Id.* at 495.

  Applying the *Castaneda* test, the Michigan Court of Appeals found that Petitioner

failed to state a *prima facie* case of racial discrimination:

>  We note that defendant was indicted by the same grand jury that indicted the
> defendant in *Glass* and that defendant's statistical challenge of this grand jury is
> identical to the statistical challenge made by the defendant in *Glass*. *Glass*, *supra* 464
> Mich 273-274, quoting *Glass*, *supra* 235 Mich App 459-460.[4]  Thus, our decision
> regarding defendant's Sixth and Fourteenth amendment challenges is mandated by
> the Supreme Court's decision in *Glass*, *supra* 464 Mich 266. There, the Court agreed
> with the Court of Appeals decision that "defendant has not presented a prima facie
> case of discrimination under the Fourteenth Amendment"[5] and further held that the

---

[4]In *Glass*, the defendant argued that:

>  [T]he population of Clinton County is 3.85 percent African-American and 13.8 percent of
> the total population of the three counties, the population of Eaton County is 3.56 percent African-
> American and 21.47 percent of the total population of the three counties, and the population of Ingham
> County is 9.87 percent African-American and 65.16 percent of the total population of the three
> counties. Defendant thus contended that this Court's order that five grand jurors be from Clinton
> County, six from Eaton County, and six from Ingham Count amounted to a systematic
> overrepresentation of the counties with the smallest African-American population and a systematic
> underrepresentation of the county with the largest African-American population. Defendant further
> contended that if proper percentages had been used, Clinton County would have had four grand jurors,
> and Ingham County would have had eleven grand jurors. [*Glass*, *supra* 464 Mich 273-274, quoting
> *Glass*, *supra* 235 Mich App 259-260 (footnotes omitted).]

[5]In finding that the defendant's statistical evidence was insufficient to establish a prima facie case
of discrimination under the Fourteenth Amendment, the Court of Appeals majority stated that:

> because [the defendant] has not provided evidence regarding the racial composition of the grand jury
> venire, he has not shown that the underrepresentation of African-Americans was due to a systematic
> exclusion of their members during the selection process, and he has not shown that the grand jury
> selection procedure was racially biased or susceptible to abuse. [*Glass*, *supra* 235 Mich App 470.]

defendant would not be able "to establish a prima facie case upon further review of the grand jury proceedings because he will be unable to establish a discriminatory purpose." *Glass*, *supra* 464 Mich 285. In so holding, the Court stated that:

> Defendant does not challenge the manner in which the jury impaneling was implemented. Defendant's claim is premised solely upon the allegedly disparate effect of the 6-5-5 composition of grand jurors from the three counties chosen by the Court of Appeals. Defendant does not present evidence suggesting a discriminatory purpose, and not[h]ing in the grand jury record could conceivably aid defendant in his effort to prove that the Court of Appeals acted with discriminatory purpose in establishing the 6-6-5 split.
>
> The possibility of an adverse effect on the representation of blacks resulting from the 6-6-5 composition is relevant to discriminatory purpose, but is insufficient alone to establish that it was a purposeful device to exclude blacks from the grand jury. [*Id.* at 285-286 (internal citations omitted).]

In the instant case, defendant presents no greater proof in support of his claim than did the defendant in *Glass*. Therefore, we conclude not only that defendant failed to present a prima facie case of racial discrimination in the grand jury selection process under the Fourteenth Amendment, *Glass*, *supra* 464 Mich 285, but also conclude that because "defendant will be unable to establish a discriminatory purpose," defendant would not be able to present a prima facie case of racial discrimination even upon review of the grand jury proceedings. *Glass*, *supra* 464 Mich 286.[6]

The decision of the Michigan Court of Appeals is not a violation of clearly established Supreme Court precedent. As an African-American, Petitioner is a member of a distinct class that is capable of being singled out for different treatment under the laws. *See Rose v. Mitchell*, 443 U.S. 545, 565 (1979). Petitioner, therefore, satisfies the first part of the test. However, as the

---

[6]This finding is mandated because in this case, as in *Glass,* "defendant does not challenge the manner in which the jury impaneling was implemented." *Glass*, *supra* 464 Mich 285. We further find that "because defendant cannot, upon further discovery, establish a prima facie case under either the Fourteenth or Sixth Amendment, ... the reasons for secrecy of grand jury proceedings outweigh the desirability of further discovery." *Id* at 289. Additionally, the Supreme Court in *Glass* expressly held that this Court abused its discretion when it ordered an in camera review of the grand jury proceedings in *Glass*. *Id.* Defendant here relies on the same facts and arguments relied upon by the defendant in *Glass* to support his contention that an in camera review of the grand jury proceedings is warranted. Thus, pursuant to *Glass*, we decline to order in camera review as impermissible on these facts.

Michigan Court of Appeals concluded, Petitioner cannot satisfy the second requirement because Petitioner does not allege or show that the selection procedure used by the state to select the multicounty grand juries is susceptible to abuse or is not racially neutral. *See Id.* Petitioner does not challenge how the grand jurors were individually selected or drawn from the three participating counties. Petitioner challenges only the apportionment of grand jurors among the three counties, claiming that the grand jury seats should have been apportioned based upon the total population of the counties. There is no evidence of discriminatory motive on the part of the Michigan Court of Appeals in apportioning the grand seats between the three counties. Rather, it appears that the court intended to give roughly equal representation to each of the three participating counties without giving any consideration to race. The Supreme Court has never held that an equal apportionment of seats among the counties in a multicounty grand jury, rather than apportionment on the basis of population, violates the Equal Protection Clause. Accordingly, Petitioner is not entitled to habeas corpus relief.

II.     **Ground II: Speedy Trial**

In his second ground for habeas corpus relief, Petitioner claims that he was denied his constitutional right to a speedy trial and the benefit of Michigan's "180-day rule" when more than three years passed from the date of his arraignment on June 15, 1995, until his trail commenced on September 29, 1998.

Petitioner's claim under the 180-day rule is easily resolved. Michigan's so-called "180 day rule" provides that an inmate of a state correctional facility must be brought to trial for other untried charges pending against the inmate within 180 days of the Michigan Department of Corrections providing notice to the prosecutor of the place the prisoner is imprisoned. MICH. COMP.

LAWS § 780.131.[7]  A federal court can grant habeas corpus relief only on the ground that a state prisoner is in custody in violation of the federal Constitution or laws.  28 U.S.C. § 2254(a).  A question concerning a perceived error of state law cannot serve as the basis for habeas corpus relief. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  "Today, we reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions." *Id.* at 68. The Sixth Circuit routinely denies habeas corpus relief for alleged violations of state statutory speedy-trial provisions. *See Hutchison v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984); *Wilcher v. Rose*, No. 95-3835, 1996 WL 262951, *1 (6th Cir. May 16, 1996).  Consequently, Petitioner has no right to relief for any violation of the state statute and may rely only on federal principles challenging the delay between arrest and trial.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy trial and public trial." U.S. Const. amend. VI.  The right to a speedy trial applies to the states through the Fourteenth Amendment. *Klopfer v. North Carolina*, 386 U.S. 213 (1967).  In *Barker v. Wingo*, 407 U.S. 514, 530-33 (1972), the Supreme Court articulated four factors that must be considered in determining whether the right to a speedy trial has been violated: (1) whether the delay was uncommonly long; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether prejudice resulted to the defendant. No one of these factors constitutes a "necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." *Id.* at 533.  "Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Id.*

---

[7]The Michigan Court of Appeals concluded that because Petitioner was not an inmate in a state correctional facility, the statute simply did not apply to him.  See MCOA Op. at 8.

Applying the *Barker* factors, the Michigan Court of Appeals concluded that

Petitioner's right to speedy trial was not violated:

With respect to defendant's claim that he was denied his right to a speedy trial, considering all the relevant factors under the circumstances, we are not convinced that defendant's constitutional right was violated. When evaluating an alleged violation of a right to a speedy trial, this Court considers four factors: (1) the length of the delay, (2) the reasons for the delay, (3) the defendant's assertion of the right to a speedy trial, and (4) any prejudice to the defendant." *Cain, supra* at 112; *People v Williams*, 163 Mich App 744, 755; 415 NW2d 301 (1987).

First, the length of the delay between defendant's indictment in June 1995 and his trial in September 1998 was certainly considerable. However, the length of the delay, alone, is not determinative. *Cain, supra* at 112. This Court has upheld delays even longer than the one in the instant case where appropriate. See e.g., *People v Simpson*, 207 Mich App 560, 563; 526 NW2d 33 (1994) (4½ years); *People v Smith*, 57 Mich App 556; 226 NW2d 673 (1975) (nineteen years). Nonetheless, because the delay exceeds eighteen months, defendant is entitled to a presumption of prejudice that the prosecution has the burden to rebut. *Cain, supra* at 112; *Gilmore, supra* at 460.

Second, the reasons for the delay in this case were varied. The brief delay from defendant's indictment in June 1995 until he waived his preliminary examination in August 1995 was inherent in the court system. Delays inherent in the court system are technically attributable to the prosecutor, but are given neutral tint and minimal weight. *Gilmore, supra* at 460. The delay from August 1995 to October 1995 is attributable to defendant because he moved to remand to the district court for a preliminary examination, arguing ineffective assistance of counsel. Time needed to adjudicate defense motions is charged to the defendant. *Id.* at 461. In November 1995, defendant specifically waived his right to a prompt preliminary examination until the redacted grand jury transcripts were released to him, which occurred in February 1996.  This express waiver thus extinguished any error resulting from the delay. See *People v Carter*, 462 Mich 206, 215-216; 612 NW2d 144 (2000).

The record is unclear as to the reason for the one-year delay between defendant's receipt of the grand jury transcripts in February 1996 and the scheduled preliminary examination date of February 14, 1997.[8] Unexplained delays are attributed to the prosecution. *People v Ross*, 145 Mich App 483, 491; 378 NW2d 517

---

[8]The prosecutor asserts that the court file was lost during this one-year period; however, the record demonstrates that the court file was not lost until after defendant's appeal to the circuit court in December 1997.

- 22 -

(1985). However, this delay must be considered together with the third factor, defendant's assertion of his right to a speedy trial. Defendant waited until February 13, 1997, the day before the scheduled preliminary examination, to file a motion to dismiss and formerly [formally] assert his right to a speedy trial. Thus, the delay between February 1997 and December 1997, the time period required to adjudicate defendant's motion to dismiss and the resultant interlocutory appeal to circuit court, is attributable to defendant. *Cain, supra* at 113; *Gilmore, supra* at 461.

After the circuit court denied defendant's appeal, the court file was inexplicably lost while being returned to the district court and had to be reconstructed. This delay was attributable to the prosecution, but only accounted for two months because the preliminary examination was eventually held on February 24, 1998. Further, the delay from the preliminary examination until June 1998 resulted from normal docket congestion, which is attributable to the prosecution, but with a neutral tint. *Gilmore, supra* at 460. The delay from June 1998, when defendant again moved to dismiss for violation of his right to a speedy trial and filed an application for leave to appeal the trial court's ruling, until September 14, 1998, when this Court denied defendant's application, was attributable to defendant. *Id.* Trial commenced on September 29, 1998. In sum, the prosecution was responsible for approximately twenty months of the delay, while defendant was responsible for approximately nineteen months of the delay.

With respect to the third factor, defendant's assertion of his right to a speedy trial, the record reveals that although defendant demanded a speedy trial in defense counsel's initial appearance in June 1995, he did not move to dismiss the charge based on that right until the day before the preliminary examination was scheduled in February 1997, almost two years later. Thus, we conclude that defendant's failure to timely assert his right in this case weighs against a finding that he was denied a speedy trial. *People v Wickham*, 200 Mich App 106, 112; 503 NW2d 701 (1993) (the defendant failed to timely assert his right when he demanded a jury trial initially, but did not pursue the issue until twenty months after his arrest).

Lastly, we consider the prejudice to defendant, both to the person and to the defense. *Gilmore, supra* at 461-462. Defendant was not incarcerated while awaiting trial, but had been released on bond; thus, there was no prejudice to the person. *Id.* at 462; *Wickham, supra* at 112. Although defendant claims that the delay caused witnesses' memories to fade, hindering his ability to effectively examine them, this general allegation is insufficient to establish prejudice to the defense. *Gilmore, supra* at 462. In any event, the fading of witnesses' memories would tend to assist defendant, rather than prejudice him. Indeed, a review of defense counsel's crossexamination of prosecution witnesses reveals that the witnesses' fading memories provided ammunition for defendant to impeach by prior inconsistent statements. Thus, although prejudice to defendant was presumed given the length of the delay, we conclude that the prosecutor has overcome that presumption of prejudice in this case.

(MCOA Op. at 7-9.)

In order to grant habeas relief, this Court must find that the decision of the Michigan Court of Appeals was an unreasonable application of clearly established Supreme Court authority. 28 U.S.C. § 2254(b).   Under *Barker*, the Court first must consider whether the delay was uncommonly long.   If the length of the delay is not "uncommonly long," no further judicial examination is required. *Doggett v. United States*, 505 U.S. 647, 652 (1992); *Maples v. Stegall*, 427 F.3d 1020, 1025 (6th Cir. 2005).   The length of the delay is measured from the earliest of the date of the indictment or the date of the arrest. *Maples*, 427 F.3d at 1026 (citing *United States v. Marion*, 404 U.S. 307, 320 (1971)).   A delay of more than one year between accusation and the beginning of trial is generally considered "presumptively prejudicial," and triggers application of the remaining three factors. *Doggett*, 505 U.S. at 652 n.1; *Maples*, 427 F.3d at 1026.   Because approximately thirty-nine months elapsed from Petitioner's indictment until his trial, the delay is presumptively prejudicial.   Accordingly, the Court must consider the other three factors.

The second *Barker* factor is the reason for the delay.   In considering this factor, the Court must weigh some reasons more heavily than others.   For example, government delays motivated by bad faith, harassment, or attempts to seek a tactical advantage weigh heavily against the government, while "more neutral" reasons such as negligence or overcrowded dockets weigh against the state less heavily. *Barker*, 407 U.S. at 531; *Maples,* 427 F.3d at 1026.   The purpose of the inquiry is to determine "whether the government or the criminal defendant is more to blame for [the] delay." *Doggett*, 505 U.S. at 651.

The Michigan Court of Appeals attributed four distinct time periods to the defense that accounted for approximately nineteen months of the delay.   In his habeas petition, Petitioner

indicates that the four-month period from November 1995 to February 1996, while the grand jury transcripts were being prepared, was "arguably" attributable to the defense because Petitioner agreed to waive his right to a speedy trial for that time period.  (Pet., 21, docket #1.)  The petition does not specifically address or dispute the other time periods attributed to the defense by the Michigan Court of Appeals.  In his reply to respondent's answer, Petitioner concedes that fifteen months for the periods of August 1995 to October 1995, February 1997 to December 1997 and June 1998 to September 1998 were properly attributed to the defense.  (Reply Brief, 7, docket #36.)  In other words, in his reply, Petitioner concedes responsibility for all of the periods attributed to the defense by the court of appeals, except for the four-month period from November 1995 to February 1996, for which he had previously accepted responsibility in the petition.  Because Petitioner accepted responsibility for that period in his petition and does not dispute that he waived his right to a speedy trial during that time, the period from November 1995 to February 1996 should be attributed to him. Accordingly, nineteen months were properly attributed to Petitioner, while the remaining twenty months were attributed to the prosecution.

In this case, nothing in the record suggests, nor does Petitioner argue, that the delay that occurred in the prosecution of this case were motivated by bad faith, harassment or a governmental desire to seek a tactical advantage.  The delays attributed to the prosecution were the result of negligence or constituted delays inherent in the court system.  Because roughly the same time periods are attributed to each of the parties, this factor should be "neutral," weighing in neither party's favor.  *See United States v. Schreane*, 331 F.3d 548, 554-55, 556-57 (6th Cir. 2003) (citing *United States v. O'Dell*, 247 F.3d 655, 671 (6th Cir. 2001)).

The third factor that the Court must consider is Petitioner's assertion of his speedy trial rights.   A "defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Barker*, 407 U.S. at 531-32.  The Court's analysis of this factor should focus on "whether the defendant *timely* asserted his Sixth Amendment right." *Wilson v. Mitchell*, 250 F.3d 388, 396 (6th Cir. 2001) (emphasis added).  Petitioner's appointed counsel filed perfunctory demands for a speedy trial with his initial appearance on June 15, 1995, and on September 8, 1995, after he replaced retained counsel. Petitioner did not re-assert his right to a speedy trial until he moved to dismiss on February 13, 1997, one day before his preliminary examination was scheduled to be held.  Petitioner's motion to dismiss followed a full year of inactivity in his case.   While the year of delay preceding the filing of Petitioner's motion to dismiss was attributed to the prosecution, the timing of Petitioner's motion a day before the preliminary examination was scheduled casts some doubt on the sincerity of his efforts to obtain a speedy trial.  Moreover, Petitioner waited to assert a violation of his speedy trial rights until twenty months after  he was indicted on the charges.  Petitioner untimely assertion of his speedy trial right weighs against him.

The fourth factor is whether the delay caused prejudice to the defense. The Supreme Court has held that the accused need not point to "affirmative proof of particularized prejudice" in every case. *Doggett,* 505 U.S. at 655. Rather, the Court had "recognize[d] that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id.*  However, prejudice is not presumed in every case in which there is a delay. *See Maples*, 427 F.3d at 1030.  When the delay is lengthy and attributable to the bad-faith of the government, no showing of prejudice is required. *Doggett*, 505 U.S. at 657.  In a case such as this,

- 26 -

where there is evidence of negligence on the government's part, but no bad faith, judicial "toleration of such negligence varies inversely with its protractedness." *Id.* In *Doggett,* the Court found sufficiently excessive a delay "six times as long as that generally sufficient to trigger judicial review." *Id.* at 658. The Sixth Circuit has found presumptive prejudice in cases with similar delays. *See United States v. Graham,* 128 F.3d 372, 376 (6th Cir. 1997) (8 years); *United States v. Brown,* 169 F.3d 344, 351 (6th Cir. 1999) (5 1/2 years). The Sixth Circuit has not found a presumption of prejudice in cases where the delay attributed to the government is considerably less than in *Graham* or in *Brown. See Maples*, 427 F.3d at 1031 (citing cases). The Court will not presume prejudice in this case where the total delay was considerably less than five years and only twenty of those months were attributable to the prosecution.[9]

In determining actual prejudice, the Court must consider the following three defense interests: (1) oppressive pretrial incarceration; (2) anxiety and concern of the accused; and (3) the possibility that the defense will be impaired. *Barker,* 407 U.S. at 532. "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.* Petitioner argues only the third form of prejudice in this case. Petitioner generally asserted on direct appeal that the delay caused increased difficulty in locating witnesses to rebut "dated" allegations related to the alleged conspiracy that allegedly occurred from 1989 through 1993. Petitioner, however, does not allege that specific witnesses were unavailable due to the passage of time, or that he was prejudiced in any other way. In light of trial record, Petitioner's allegations of prejudice fall far short of showing that his defense was impaired by the delay that

---

[9]As the Sixth Circuit noted in *Maples*, "Presumptively prejudicial for purposes of triggering the *Barker* four-factor inquiry is different from 'presumptively prejudicial' for purposes of assessing the prejudice prong. The first only requires that the delay have approached one year. The latter concerns whether the delay was excessive." *Id.* at 1030.

occurred in the prosecution of this case.  The prejudice prong, therefore, weighs in favor of the state.

Taking all of the above factors into account, the decision of the Michigan Court of Appeals, that the thirty-nine month delay between Petitioner's indictment and the start of his trial was not a violation of petitioner's right to a speedy trial, was not an unreasonable application of *Barker* and its progeny.

III.   **Grounds III, VI and IX: Prosecutorial Misconduct**

Petitioner asserts three instances of prosecutorial misconduct.   In Ground III, Petitioner claims that the prosecutor interjected factual and argumentative statements into the *voir dire* of prospective jurors.   In his sixth ground for relief, Petitioner asserts that he was denied a fair trial when the prosecutor vouched for the credibility of a prosecution witness.   In Ground IX, Petitioner alleges the prosecutor engaged in misconduct when he allowed a witness to give false testimony.

With regard to Petitioner's claims of prosecutorial misconduct, the Michigan Court of Appeals held:

> With respect to defendant's claim that the prosecutor engaged in misconduct during voir dire, defendant failed to object to the alleged misconduct at trial and expressed satisfaction with the jury and he has thus failed to preserve this issue for appellate review. *People v Schutte*, 240 Mich App 713, 720; 613 NW2d 370 (2000) *People v Bell*, 209 Mich App 273, 278; 530 NW2d 167 (1995). In addition, because defense counsel affirmatively expressed satisfaction with the jury, this issue has been waived. See *Carter, supra* at 214-216; *People v Tate*, 244 Mich App 553, 558; 624 NW2d 524 (2001). In any event, assuming that this issue was not waived, we note that this Court reviews unpreserved claims of prosecutorial misconduct for plain error, *Schutte, supra*, and in order to avoid forfeiture under the plain error rule, the defendant must demonstrate plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Reversal is warranted only where the plain error "resulted in the conviction of an actually innocent defendant" or where the error "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 763.

- 28 -

A review of the challenged comments during voir dire reveals that the prosecutor was simply explaining to the jurors the nature of the charge against defendant to discern whether jurors would be able to be fair and impartial in this case. The prosecutor was seeking to impanel an impartial jury by eliciting sufficient information to develop a rational basis for excluding those who are not impartial from the jury. *People v Tyburski*, 445 Mich 606, 618; 518 NW2d 441 (1994) (Mallett, J.); *People v Dunham*, 220 Mich App 268, 270; 559 NW2d 360 (1996). The prosecutor never promised the jurors what the evidence would show; rather, he merely informed them of what the allegations were. Accordingly, we conclude that the prosecutor's statements during voir dire were not improper. Defendant has not demonstrated plain error that affected his substantial rights. *Carines, supra*.

We also find no merit to defendant's claim that the prosecutor improperly vouched for the credibility of prosecution witness Tracy Edmonds[10] by stating that the police had time to verify Edmonds' statements, implying that the police and the prosecutor knew he was telling the truth. Again, defendant failed to object to the comment during trial or request a curative instruction; thus, we review the claim for plain error. *Carines, supra* at 763; *Schutte, supra* at 720.[11]

Defendant objects to the following remarks made by the prosecutor during closing argument:

> But, again, he has been incarcerated since 1994. He hasn't had a chance to talk to Tamper Allen, Bill Sorrell, or Michael Sorrell. He has given multiple statements to the police, DEA, FBI, many people over this time period. He has testified in the Grand Jury, and preliminary exam, and in a trial over this time period. The police have had ample opportunities to check those statements out.

A prosecutor may not vouch for the credibility of a witness, nor suggest that the government has some special knowledge that the witness is testifying truthfully. *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995); *People v Howard*, 226 Mich App 528, 548; 575 NW2d 16 (1998). However, a prosecutor may argue from the evidence that a witness is credible. *Howard, supra*. We find nothing improper with the challenged remarks in this case. The prosecutor did not expressly state that the police had verified Edmonds' statement; rather, he was simply arguing from the facts in evidence that the witness was credible. Further, many witnesses testified in this case regarding the multiple cocaine transactions in which defendant participated.

---

[10]Throughout its opinion, the Michigan Court of Appeals misspelled Tracy Edmond's last name by adding an "s."

[11]The trial court subsequently denied defendant's motion for a mistrial due to the prosecutor's comments.

Thus, this case was not a mere credibility contest between defendant and one witness. Cf. *People v Smith*, 158 Mich App 220, 231-232; 405 NW2d 156 (1987). On this record, we are not convinced that the prosecutor's statements constituted improper vouching for the credibility of a witness, nor do we find that defendant was denied a fair trial as a result of the remarks.

Defendant also contends that the prosecutor committed misconduct by failing to correct the knowingly false testimony of William Sorrell. Specifically, defendant argues that Sorrell perjured himself when he testified that he had not received anything in exchange for his testimony, even though the Tri-County Metro Narcotics Squad provided a letter, dated October 25, 1995, to the parole board on behalf of Sorrell. This letter indicated that Sorrell had been cooperative with law enforcement and prosecutors and requested that it be placed in Sorrell's parole file. Therefore, defendant contends that pursuant to *People v Atkins*, 397 Mich 163, 173; 243 NW2d 292 (1976), because Sorrell was given leniency in exchange for his testimony against defendant, the prosecutor had a duty to disclose this to the jury.

However, while it is apparent that the Tri-County Metro Narcotics Squad provided this letter to the parole board, there is no indication that either Sorrell or the prosecutor knew of its existence or that it had any bearing in the parole board's decision to parole Sorrell. In addition, because the letter is dated October 26, 1995 and defendant['s] trial took place in October of 1998, it is evident that the letter was sent based on cooperation Sorrell had provided long before defendant's trial. Because defendant has failed to show that Sorrell perjured himself, that the prosecutor knew of the letter or of Sorrell's perjury, or that the letter was provided in exchange for Sorrell's testimony at defendant's trial, we find this issue to be without merit. See *Atkins*, *supra* at 173-174.[12]  Further, assuming Sorrell's testimony was untrue and that the prosecutor knew that it was untrue, we note that it was elicited by defense counsel during cross-examination, not by the prosecutor during direct, and that the jury had the opportunity to consider what, if any, effect this letter may have had on Sorrell's testimony. Thus, since "the disclosure requirement may be considered satisfied where the 'jury [is] made well aware' of such facts 'by means of . . . thorough and probing cross-examination by defense counsel,'" *People v Mumford*, 183 Mich App 149, 152; 455 NW2d 51 (1990), quoting *Atkins*, *supra* at 174, we would find that the duty to disclose was met in this case. See also *People v Woods*, 416 Mich 581, 602; 331 NW2d 707 (1982) and *People v Wilson*, 242 Mich App 350, 358; 619 NW2d 413 (2000).

---

[12]We also note that defense counsel never requested that the prosecutor inform the jury of the alleged leniency. Without such a request, it is doubtful that the prosecutor would have any duty to disclose the information. See *People v Woods* 416 Mich 581, 602; 331 NW2d 707 (1982) and *People v Atkins*, 397 Mich 163, 173 n 10.

(MCOA Op. at 10-12.)

Respondent maintains that Petitioner's first two claims of prosecutorial misconduct are procedurally defaulted. When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107, 108 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim "will result in a fundamental miscarriage of justice." *Hicks*, 377 F.3d at 552; *see Murray v. Carrier*, 477 U.S. 478, 495 (1986) (specifying that a "fundamental miscarriage of justice" will result "where a constitutional violation has probably resulted in the conviction of one who was actually innocent.").

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's first two claims of prosecutorial misconduct. It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See, e.g.*,

*People v. Kelly*, 378 N.W.2d 365, 369 (Mich. 1985).  A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy."  *Lee v. Kemna*, 534 U.S. 362, 385 (2002).  Petitioner's failure to comply with the state's contemporaneous objection rule caused him to default his claims in state court.  After expressly noting Petitioner's default in failing to object, the Michigan Court of Appeals then reviewed Petitioner's claims for plain error, finding none.  In this circuit, "plain error review does not constitute a waiver of state procedural default rules."  *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000) (citations omitted); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000); *Atkins v. Phillips*, No. 00-1150, 2000 WL 1720719 (6th Cir. Nov. 8, 2000); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (state court's alternative holding on the merits does not require federal court to disregard the procedural bar); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir.1991) (same); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989) (claim is defaulted even where the state court may excuse the default for "manifest injustice").

        As set forth above, in order for the Court to consider Petitioner's defaulted claims, he must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim "will result in a fundamental miscarriage of justice."  *Hicks*, 377 F.3d at 552.  Petitioner has not attempted to explain his failure to raise timely objections to the first two alleged instances of prosecutorial misconduct.  Where a petitioner fails to show cause, the court need not consider whether he has established prejudice.  *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).  Petitioner also has not demonstrated that manifest injustice would result because he has not made a colorable claim of innocence; he has not shown that

any constitutional error "probably" resulted in the conviction of one who was actually innocent. *Schlup v. Delo*, 513 U.S. 298, 322 (1995) (citing *Murray*, 477 U.S. at 495).  As set forth below, the prosecutor presented more than sufficient evidence to support Petitioner's conviction.  Accordingly, Petitioner's claims of prosecutorial misconduct asserted in Grounds III and VI are barred from habeas corpus review.

In his ninth ground for habeas relief, Petitioner alleges the prosecutor engaged in misconduct when he allowed prosecutorial witness William Sorrell to give "false and perjured" testimony that he received no consideration for his testimony.  The "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice."  *Giglio v. United States*, 405 U.S. 150, 153, (1972) (citations and internal quotations omitted).  This rule applies to both the solicitation of false testimony and the knowing acquiescence in false testimony.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  To prevail on a habeas claim of perjury, the petitioner must show knowing use by the state of perjured testimony.  *Burks v. Egeler*, 512 F.2d 221, 224 (6th Cir. 1975).  *See also Workman v. Bell*, 178 F.3d 759, 766 (6th Cir. 1998), (petitioner "must show that (1) the evidence the prosecution presented was false; (2) the prosecution knew it was false; and (3) the false evidence was material.").

For the reasons set forth above by the Michigan Court of Appeals, Petitioner was not denied a fair trial as the result of the prosecutor's alleged misconduct.  Most notably, there is no indication that the prosecutor was aware that the Tri-Counties Metro Narcotics Squad sent a letter to the parole board on behalf of Sorrell in 1995, three years before Petitioner's trial.  As noted by the Michigan Court of Appeals, the letter was obviously sent to reward Sorrell for assistance he provided long before he testified at Petitioner's trial.  Sorrell, in fact, had testified before the grand jury in May

- 33 -

and June 1995. (Tr III, 81.)  Furthermore, defense counsel cross-examined William Sorrell regarding

the letter.  (Tr III, 56-57.)  Therefore, the jurors were aware of the letter and could reach their own

conclusions concerning whether Sorrell's received consideration for his testimony and what effect,

if any, that had on his credibility.  Accordingly, Petitioner is not entitled to habeas corpus relief on

Ground IX.

IV.     **Ground IV: Other Acts Evidence**

Petitioner argues that his due process rights were violated as the result of "bad acts"

evidence offered by witness Tracy Edmond.  Specifically, Edmond testified that he instructed

Petitioner not to use violence in conducting the drug trade, suggesting that Petitioner had been a

violent person in the past.  The following exchange occurred between the prosecutor and Edmond:

Q:      You talked about how you wanted to, or you counseled with the Defendant
        in terms of doing business?

A:      Um-hum.

Q:      Describe for the jury what you mean by that?

A:      Well, first of all, I didn't need any violent - - we didn't need any, because I
        was already being, I was under surveillance by the FBI. I just didn't need any
        more heat. I didn't want to go to prison. So when I talk to Thorn, Thorn, he
        got into a lot of confrontations from time to time around town. I said, listen,
        we don't need no fighting.

Q:      Keep your voice up.

A:      We don't need no fighting. We don't need anybody coming up dead. We
        don't need none of that. If somebody beats us out of our money, you know,
        we may go talk to them and everything. But it's not worth getting a case
        about, getting another case. So I really wanted to try to tone him down from
        what you - - how he used to be in the past.

- 34 -

(Tr IV, 45.)  Immediately after Edmond made these statements, defense counsel requested a sidebar.  (Tr IV, 45.)  After the sidebar, the prosecutor asked the witness not to talk about anything other than what the prosecutor was asking.  (Tr IV, 46.)  A short time later, defense counsel requested to make a motion.  (Tr IV, 49.)  Once the jury had been excused, defense counsel moved for a mistrial as the result of Edmond's suggestion that Petitioner had engaged in violent crimes, including murder.  (Tr IV, 49-50.)  The trial court denied the motion, but offered to give a curative instruction at Petitioner's request.  (Tr IV, 51-52.)  Defense counsel asked Edmond, who was still on the stand, whether Petitioner had ever participated in causing the death of any person.  Edmond replied, "Never."  (Tr IV, 52.)  The parties agreed that defense counsel could ask that question of Edmond on cross-examination without opening the door to other violent behaviors.  (Tr IV, 52.)

The Michigan Court of Appeals concluded that Edmond's testimony was improper, but did not warrant a mistrial, stating:

> Although Edmond's testimony may have inappropriately implied that defendant was involved in violent, confrontational activity in the past, we are not convinced that the admission of this brief and unsolicited testimony warranted a mistrial. Where error involved unsolicited remarks by a witness, "[a] mistrial should be granted only where the error complained of is so egregious that the prejudicial effect can be removed in no other way." *People v Gonzales*, 193 Mich App 263, 266; 483 NW2d 458 (1992). Generally, "an unresponsive, volunteered answer to a proper question is not grounds for the granting of a mistrial." *People v Haywood*, 209 Mich App 217, 228; 530 NW2d 497 (1995). "This is especially true where the defendant has rejected the opportunity to have the jury charged with a cautionary instruction." *People v Lumsden*, 168 Mich App 286, 299; 423 NW2d 645 (1988).
>
> In this case, any prejudice caused by Edmonds' remarks could have been cured by a timely instruction to the jury. Indeed, the trial court offered to provide a curative instruction to, remove any potential prejudice, but defendant refused the instruction, seeking to void any further emphasis of the remarks. Further, defendant does not argue, and the record does not show, that the prosecutor elicited the improper testimony or knew that Edmonds would make the challenged remarks. See *People v Hackney*, 183 Mich App 516, 531; 455 NW2d 358 (1990); *People v Barker*,

- 35 -

161 Mich App 296, 307; 409 NW2d 813 (1987).[13]  Defendant was not denied a fair and impartial trial by Edmonds' testimony and the trial court did not abuse its discretion in refusing to grant a mistrial.

(MCOA Op., 13.)

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle*, 502 U.S. at 67-68, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour,* 224 F.3d at 552; *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

Petitioner was not denied a fundamentally fair trial as the result of Edmond's comments.  While Edmond's comments suggested that Petitioner had engaged in acts of violence, they were brief and unsolicited.  Moreover, defense counsel elicited Edmond's testimony on cross-examination that Petitioner "never" participated in causing the death of any person, which dispelled the more serious suggestion that Petitioner had committed murder.  (Tr IV, 52.)  The trial court

---

[13]After Edmonds' made the challenged remarks, a bench conference was held and the prosecutor instructed Edmonds not to discuss anything beyond what the prosecutor was directing his attention to.

allowed defense counsel to elicit that testimony from Edmond on cross-examination without opening

the door to Petitioner's other violent behavior.  Moreover, Petitioner was not charged or convicted

in this case with any violent crimes.  As discussed in the next section, the prosecutor presented

overwhelming evidence of Petitioner's guilt of conspiracy to deliver more than 650 grams of

cocaine.  Petitioner, therefore, is not entitled to habeas relief as a result of Edmond's comments.

## V.     Ground V: Failure to Instruct on Included Offenses

Petitioner claims that the trial court violated his due process rights when it denied

defense counsel's request for a jury instruction on the lesser included offenses of conspiracy to

deliver 225 to 650 grams of cocaine and conspiracy to deliver 50 to 225 grams of cocaine.  The

Michigan Court of Appeals agreed that, under Michigan law, the trial court erred by failing to

instruct on the lesser included offenses.  (*See* MCOA Op. at 13-14.)  Nevertheless, the court of

appeals concluded that the error was harmless, stating:

> However, a trial court's failure to grant a requested instruction is subject to the
> harmless error analysis. *Mosko, supra* at 502-503. In this case, the evidence
> overwhelmingly demonstrated that defendant conspired to deliver several kilograms
> of cocaine. Indeed, each prosecution witness testified that defendant was involved in
> cocaine transactions totaling far more than 650 grams, and many of the witnesses
> testified that defendant participated in multiple transactions of a kilogram, totaling
> thousands of grams of cocaine. Thus, it cannot seriously be disputed that the amount
> of cocaine involved in this case exceeded 650 grams. Under these circumstances, the
> jury could not reasonably have convicted defendant of the lesser offenses and the trial
> court's failure to instruct the jury on the requested lesser included offenses was
> harmless error.

(MCOA Op. at 15.)

Although the Supreme Court has held that it is a violation of due process for a court

to fail to instruct on a lesser included offense supported by the evidence in a capital case, *see Beck*

*v. Alabama*, 447 U.S. 625, 627 (1980), it has not so held in noncapital cases.  To the contrary, the

- 37 -

Sixth Circuit has held that failure to instruct on a lesser included offense in a noncapital case is not "such a fundamental defect as inherently results in a miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (plurality opinion) (en banc); *see also Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002); *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001). A due process violation occurs only when the failure to consider and give a lesser-included offense instruction in a non-capital case amounts to a defect so fundamental as to cause a complete miscarriage of justice. *Bagby*, 894 F.2d at 797.

Here, there is no miscarriage of justice or fundamental defect in due process. As noted by the Michigan Court of Appeals, the prosecutor presented overwhelming evidence that Petitioner conspired with others to deliver far more than 650 grams of cocaine. Tamper Allen testified as to two transactions in which he and Petitioner purchased a kilo of cocaine (approximately 1000 grams) to sell. In each case, Allen took no more than six ounces to make into crack cocaine for sale on the street and Petitioner sold the remainder of the kilo to his customers. (Tr II, 6-25, 42, 90-98, 178.) Mike Sorrell testified that in late 1990 through early 1991, he drove Petitioner to Detroit once or twice a week to pick-up cocaine. (Tr II, 139-44, 159.) On those trips, Petitioner purchased as much as a kilo of cocaine at one time. (Tr II, 143-44.) Mike further testified that he personally sold more than four kilos of cocaine for Petitioner. (Tr II, 145.) Bill Sorrell testified that he drove Petitioner to Detroit to purchase drugs approximately twenty-five times from late 1989 to early 1991. (Tr III, 15-16, 34-42.) Bill estimated that Petitioner purchased 15 to 20 kilos of cocaine during the period. (Tr III, 33.) Tracy Edmond testified that in 1990, he sold Petitioner nine ounces of cocaine on five to ten occasions. (Tr IV, 16, 19-20.) Edmond estimated that he and Petitioner

subsequently engaged in five to ten transactions involving a half kilo in 1991. (Tr IV, 20-21.) They eventually moved up to kilo transactions in late 1991 and 1992. (Tr IV, 23.) Edmond testified that he sold Petitioner a kilo of cocaine anywhere from ten to twenty times. (Tr IV, 24.) By the time they became partners in late 1992 or 1993, Edmond estimated that he had sold Petitioner twenty kilos of cocaine. (Tr IV, 24.) In light of this evidence, the trial court's refusal to instruct the jury on quantities less than 650 grams clearly did not result in a miscarriage of justice.

## VI.   Ground VIII: Sufficiency of the Evidence

Petitioner contends that the prosecutor failed to present sufficient evidence that he conspired to deliver 650 grams or more of cocaine. A § 2254 challenge to the sufficiency of the evidence is governed by the standards set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The Michigan Court of Appeals rejected Petitioner's claim on appeal, stating:

> To determine whether the evidence was sufficient to sustain defendant's conviction, we review the lower court record in the light most favorable to the prosecution to determine whether a rational jury could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v Oliver*, 242 Mich App 92, 94; 617 NW2d 721 (2000); *People v Noble*, 238 Mich App 647, 655; 608 NW2d 123 (1999). Our Supreme Court has stated that in order to be convicted of conspiracy to possess with intent to deliver a controlled

- 39 -

substance, the prosecution [must] prove that (1) the defendant possessed the specific intent to deliver the statutory minimum as charged, (2) his coconspirators possessed the specific intent to deliver *the statutory minimum as charge*, and (3) the defendant and his coconspirators possessed the specific intent to combine to deliver the *statutory minimum as charged* to a third person. [*Mass*, *supra* 464 Mich 630, citing *People v Justice (After Remand)*, 454 Mich 334, 349; 562 NW2d 652 (1997) (emphasis added).]

Thus, in the instant case, the prosecution had to present evidence that proved beyond a reasonable doubt that plaintiff conspired to deliver more than 650 grams of cocaine. In this regard, we note that both Tamper Allen and Edmonds testified that they and defendant agreed to be partners with defendant in order to sell cocaine in the Lansing area. In addition, Edmonds testified that on at least two occasions he had supplied Allen and defendant with one kilogram of cocaine to sell and that on one occasion he supplied defendant with two kilograms for the purposes of sale. Michael Sorrell also testified that defendant had up to one kilogram of cocaine at a time and that he had sold more than four kilograms of cocaine on behalf of defendant. Based on this testimony, we conclude that when viewed in the light most favorable to the prosecution, the jury was presented with sufficient evidence that defendant was guilty beyond a reasonable doubt of conspiring with others to deliver more than 650 grams of cocaine.

(MCOA Op., 17.)

Petitioner's claim of insufficient evidence warrants little discussion. As discussed in resolving Ground V above, and as set forth by the Michigan Court of Appeals, the prosecutor presented overwhelming evidence that Petitioner conspired with others to deliver more than 650 grams of cocaine. Petitioner argues that the prosecutor failed to prove that "he had specific knowledge and participation in the conspiratorial arrangements of Tracy Edmond and Tamper Allen to purchase and deliver cocaine in an amount exceeding 650 grams." (Pet., 35.) At the heart of Petitioner's argument is his assertion that Edmond and Allen were not credible witnesses. However, "attacks on witness credibility are simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence." *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002); *United States v. Adamo*, 742 F.2d 927, 935 (6th Cir. 1984). The jury could reasonably conclude

from the testimony presented by Edmond, Allen and the other prosecutorial witnesses that Petitioner conspired with them to traffic in thousands of grams of cocaine. Accordingly, the decision of the Michigan Court of Appeals is not an unreasonable application of *Jackson*.

### VII.   Cumulative Effect of the Errors

Petitioner also argues that the cumulative effect of the errors in his case violated his federal due process rights. I would not find it so in this case. However, the Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief. *See Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002). Thus, it cannot be said that the judgment of the Michigan courts is contrary to any Supreme Court decision so as to warrant relief under the AEDPA. *Cf. Walker v. Engle,* 703 F.2d 959, 963 (6th Cir.1983) (pre-AEDPA case; holding that "[e]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair"). Because Petitioner's individual assignments of error would not support habeas relief under the AEDPA, the cumulative effect thereof is likewise insufficient. *See Baze v. Parker,* 371 F.3d 310*,* 330 (6th Cir. 2004), *cert. denied*, 544 U.S. 931 (2005); *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002).

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated:  June 26, 2006                              /s/ Hugh W. Brenneman, Jr.
                                                   Hugh W. Brenneman, Jr.
                                                   United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fᴇᴅ. R. Cɪᴠ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).